## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE: | **CASE NO.: 21-31070** |
| **ENTRUST ENERGY, INC.,**[1] **ENTRUST ENERGY EAST, INC., and POWER OF TEXAS HOLDINGS, INC.,** | **CHAPTER 11**<br><br>**Jointly Administered** |
| **Debtors** | |
| **[DEBTORS/PLAINTIFFS],** | |
| **Plaintiffs,** | **ADV. PROC. NO.: _____** |
| **v.** | |
| **SHELL ENERGY NORTH AMERICA (US), L.P. and SHELL TRADING RISK MANAGEMENT, LLC** | |
| **Defendants.** | |

## COMPLAINT

Entrust Energy, Inc. (*fka* Retail OPCO of Texas, Inc.) ("Entrust"), Entrust Energy East, Inc. (*fka* North Eastern States, Inc.), ("Entrust East") and Power of Texas Holdings, Inc. ("Power of Texas") (collectively, the "Debtors" or the "Company"), by and through their undersigned counsel, file this complaint (the "Complaint") against Shell Energy North America (US), L.P. ("Shell Energy") and Shell Trading Risk Management, LLC ("Shell Trading") (collectively the "Shell Defendants"), stating as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Entrust Energy, Inc. (2194); Entrust Treasury Management Services, Inc. (2347); Entrust Energy East, Inc. (3446); Power of Texas Holdings, Inc. (8159); Knocked, Corp. (0195); Akyta Holdings, Inc. (7696); Enserve, Inc. (9111); Akyta, Inc. (7560); Energistics, Inc. (3460); SPH Investments, Inc, (0271); Akyta IP, Inc. (8798); Surge Direct Sales, Inc. (7225); Entrust Energy Operations, Inc. (7479); Strategic Power Holdings, LLC (7069); NGAE, Inc. (1888). The Debtors' mailing address is Entrust Energy, Inc., 1301 McKinney Street, Suite 2950, Houston, TX 77010.

## I.  SUMMARY OF THE ACTION

1.     This action arises from Shell Energy's failure to provide electric power prior to and during Winter Storm Uri, a major winter and ice storm that left millions across Texas without power during February of 2021. Debtors Entrust, Entrust East, and Power of Texas were parties to various agreements with the Shell Defendants under which the Shell Defendants provided comprehensive services, including commitments to sell physical electric power to the Debtors on a continuous, long-term basis at specified prices and quantities.

2.     As the temperature plummeted, weather forecasts for the week of February 15 turned increasingly bleak. Estimates of electric power consumption across Texas escalated sharply and forward market prices for electric power skyrocketed to levels far higher than the prices at which Shell Energy had contractually committed to sell power to the Debtors. In particular, market prices for electricity in the real-time energy markets administered by the Electric Reliability Council of Texas ("ERCOT") rose from prices typically below $50 per megawatt hour ("MWh") to the market-capped price of $9,000/MWh. The market prices remained as these exponentially high levels for days during Winter Storm Uri. Recognizing the opportunity to make tens of millions of dollars off the devastating storm, the Shell Defendants made the calculated decision to wrongfully terminate their relationship with the Debtors and sell their electricity at higher prices elsewhere.

3.     On Sunday evening, February 14, 2021, just hours before the full effects of Winter Storm Uri were felt across Texas, Shell Energy sent the Debtors a notice by electronic mail purporting to terminate the parties' contractual relationship with immediate effect. Shell Energy then immediately ceased its delivery of physical electricity to the Debtors. However, pursuant to the terms of the contract documents that governed the parties' relationship, Shell Energy was obligated to continue providing electricity through at least February 17, 2021, but in no event did

Shell Energy have the right to terminate providing electricity any earlier than at least February 16, 2021.

4.      The Shell Defendants' wrongful attempt to terminate their contractual obligations just hours before Winter Storm Uri's arrival, and Shell Energy's subsequent refusal to provide electricity to the Debtors, forced the Debtors to purchase electricity (to meet their customers' needs) at dramatically elevated <u>ERCOT</u> day-ahead and real-time spot market prices that the Company could not afford.[2] The Shell Defendants' actions had the immediate and foreseeable effects of putting the Debtors in default in the ERCOT market and forcing the Debtors into bankruptcy.

5.      The Debtors seek recovery of the costs they incurred due to Shell Energy's failure to meet its contractual obligations to deliver electricity through at least February 17, 2021 (but in no event any earlier than at least February 16, 2021), the settlement amount applicable to termination on February 17, 2021 (or in the alternative, at least February 16) (including attorneys' fees but excluding a netting of amounts owed to the Shell Defendants on all agreements between the parties based on equitable subordination), and interest on the foregoing amounts, all calculated in accordance with the terms of the agreements, and certain declarations as to their rights under the contract documents that governed the parties' relationship.

## II.      <u>THE PARTIES</u>

6.      Plaintiff Entrust is a Texas corporation with its principal place of business in Houston, Texas.

---

[2] ERCOT administers a day-ahead and real-time energy market in which electric power is purchased and sold the day before and the day of flow, respectively. The Debtors entered into bilateral forward contracts with Shell Energy for the vast majority of their projected energy needs and, accordingly, would only be subject to day-ahead and real-time ERCOT spot market prices for the balance of their requirements.

7.    Plaintiff Entrust East is a Delaware corporation with its principal place of business in Houston, Texas.

8.    Plaintiff Power of Texas is a Texas corporation with its principal place of business in Houston, Texas.

9.    On March 30, 2021 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"). The Debtors' bankruptcy cases are jointly administered under the lead case *In re Entrust Energy, Inc.*, Case No. 21-31070-MI.

10.    Defendant Shell Energy is a Delaware limited partnership with its principal place of business in Houston, Texas.

11.    Defendant Shell Trading is a Delaware limited liability company with its principal place of business in Houston, Texas.

### III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding. 28 U.S.C. § 157(b)(2).

13.    Pursuant to Rules 7008 and 9027(a) of the Federal Rules of Bankruptcy Procedure, the Debtors consent to entry of final orders by this Court in this adversary proceeding.

### IV.    FACTUAL BACKGROUND

A.    **The Parties**

14.    The Debtors are retail energy marketers that sold and delivered electricity and natural gas commodities to residential and commercial customers in deregulated utility markets across the United States.

15.     Defendant Shell Energy is a wholesale supplier of physical electric power and natural gas in the markets in which the Debtors provided retail supply to their customers.

16.     Defendant Shell Trading is a registered swap dealer with the Commodities Futures Trading Commission and is engaged in the wholesale marketing and trading of derivatives and other financial products across North America.

17.     The Shell Defendants provided to the Debtors and many other retail energy suppliers a comprehensive package of services. As described in the Shell Defendants' online marketing directed at retail suppliers, by entering into arrangements similar to the one at issue in this Complaint, the Shell Defendants provided to retail energy providers (who were smaller and less creditworthy than Shell Energy) comprehensive services comprised of "access to the capital and credit, energy expertise, and commodity supply you need—all under one roof."[3] Defendant Shell Energy sold physical energy products on a wholesale basis to the Debtors, thereby providing a hedge to the Debtors' physical delivery and sales obligations, and Defendant Shell Trading offered the Debtors access to financially settled hedge products.

**B.      The Parties' Contractual Relationship**

18.     Effective July 31, 2019, the Shell Defendants and Entrust Energy, Entrust Treasury Management Services, Inc., Entrust East, Power of Texas, Knocked, Corp., Enserve, Inc., Akyta, Inc., Akyta Holdings, Inc., Entrust Energy Operations, Inc., SPH Investments, Inc., Akyta IP, Inc., Surge Direct Sales, Inc., and Energistics, Inc. (collectively, the "Entrust Parties") entered into a Second Amended and Restated Global Agreement (the "Global Agreement"). The Global Agreement governed the relationships that were set forth in the various contracts between the Shell

---

[3] https://www.shell.us/business-customers/shell-energy-north-america/energy-retailers.html.

-5-

Defendants and the Debtors. For example, under the Global Agreement, Shell Energy agreed to provide credit and loans to the Debtors under a separate Loan Agreement.[4]

19.     Contemporaneously with the Global Agreement, each of the Debtors entered into a Second Amended EEI Master Power Purchase and Sale Agreement with Shell Energy (the "EEI Master Agreements"). As is typical in the energy industry, the EEI Master Agreements created the contractual framework that would govern the physical sales of electric power from Shell Energy to the Debtors. As is also typical in the electric power industry, the purpose of using the EEI Master Agreement was to reduce transaction costs and facilitate the efficiency of entering into multiple individual transactions with the same party for the purchase and sale of physical electric energy.

20.     Utilizing the framework and general terms and conditions supplied by their respective EEI Master Agreements, each of the Debtors entered into various arrangements with Shell Energy under which the Debtors agreed to purchase, and Shell Energy agreed to deliver, electric power on a long-term basis at prices and quantities specified and agreed to in Confirmations[5] between the Debtors and Shell Energy ("Transactions").[6] Pursuant to Section 2.2 of the EEI Master Agreements, each Debtor's EEI Master Agreement and all Transactions between that Debtor and Shell Energy form a single integrated agreement between those parties.

---

[4] Pursuant to the Second Amended and Restated Loan Agreement ("Loan Agreement") between Shell Energy and the Entrust Parties, under which Shell Energy agreed to establish a revolving credit facility in a specified amount upon which the Entrust Parties could borrow, prepay, and reborrow, and to make certain drawdowns or advances, including letters of credit or guarantees on behalf of the Entrust Parties, and under which the Entrust Parties agreed to pay certain Interest.

[5] Confirmation" under the EEI Master Agreement is a document substantially in the form of Exhibit A to the EEI Master Agreement sent by Seller to Buyer or Buyer to Seller shortly after a Transaction has been entered into, summarizing the key terms, including the quantity, price, delivery point, and delivery period to which the parties have agreed to for purposes of that specific Transaction.

[6] "Transaction" is defined under Section 1.60 of the EEI Master Agreements to mean "a particular transaction agreed to by the Parties relating to the sale and purchase of a Product pursuant to this Master Agreement."

21.     Appendix D-1 of the Global Agreement required the Entrust Parties to report an extensive amount of information to Shell Energy on a regular, ongoing basis, including, among other things:



22.     Section 6.1 of the Global Agreement also granted Shell Energy the right, at any time, to require that the Entrust Parties provide to Shell Energy substantial credit support, such as cash and letters of credit (beyond that provided for in the Security Agreement discussed below) within two Business Days (as hereinafter defined) after receiving any notice from Shell Energy requiring additional credit support.

23.     Under Section 8.1 of the Global Agreement, the Debtors also granted the Shell Defendants a Last Look Opportunity which assured the Shell Defendants of having the right to supply at least 70 percent of the Debtors' power requirements by matching the quote of any third party. In addition, Appendix A to the Global Agreement established a Sleeving Procedure under which one of the Shell Defendants would serve as an intermediary between the Debtors and a third party in exchange for a Sleeving Fee, as a further means of providing credit support to the Debtors.

The Sleeving Procedure was only available for transactions with third parties that had a pre-existing contractual relationship with one of the Shell Defendants and who met certain credit requirements dictated by it.

24.    The parties entered into the Global Agreement because they had developed, and intended to continue to develop a substantial business relationship under which the Debtors would buy physical and financial power and related products from Shell Energy, and Shell Energy would provide certain credit support to the Debtors.

25.    In addition to the EEI Master Agreements, the parties entered other agreements contemporaneously with the Global Agreement, including:





26.     The Entrust Parties simultaneously provided a promissory note to Shell Energy

27.     Collectively, these agreements gave the Shell Defendants nearly complete control over many aspects of the Debtors' businesses, including their financing, risk exposure, operating budget, ability to contract with third parties, and ability to pay debts as they came due.

**C.     The ERCOT Market and the Effect of Winter Storm Uri on Retail Energy Suppliers**

28.     ERCOT is an independent system operator that has operational control of the electric transmission grid in most of Texas. For purposes of this complaint, ERCOT served two crucial roles during the days in question: maintaining the electrical transmission grid and administering the real-time and day-ahead markets by which entities purchased and sold physical electric power products and related services.

29.     With respect to the former responsibility, in order to maintain the integrity of the grid, ERCOT was faced with the task of balancing energy consumption (load) with energy generation on a real-time basis. In order to do so, for retail energy customers served by retail electricity suppliers such as the Debtors, the retail supplier is required to purchase enough physical power from the ERCOT system at ERCOT market prices to meet the ever-changing consumption of its customer base at all times. By entering into Transactions for long-term continuous physical

delivery of electric power from Shell Energy at prices fixed well in advance of the date of delivery, the Debtors had hedged against the physical delivery obligations and price volatility inherent in the operation of the ERCOT system and real-time market model.

**D.     As Winter Storm Uri Approached Texas, the Shell Defendants Preemptively Attempted to Terminate Their Contractual Obligations to the Debtors**

30.     During the month of February 2021, including, but not limited to, the week of February 14-18, a record-setting winter storm named Uri engulfed the State of Texas. As a result of freezing conditions and a rapid surge in energy usage, there was a cascade of failures in the Texas power grid, leading to widespread blackouts, property loss, and business interruptions across the state.

31.     As weather forecasts for the week of February 14-18, 2021 worsened, estimated energy consumption across Texas increased rapidly and market prices for electric power skyrocketed. Under the Transactions entered into pursuant EEI Master Agreements, the Debtors had contractually insulated themselves from much of this increasing price risk by securing continuous long-term supplies of physical electric power from Shell Energy at fixed prices sufficient to meet most of the Debtors' needs, thereby hedging against ERCOT physical delivery obligation requirements and volatile market price fluctuations. As the storm approached, Shell Energy was contractually obligated to deliver these continuous supplies of electric power to the Debtors at the hedged prices, but which were now thousands of dollars per MWh below forward market prices for the week of February 14-18. In short, if Shell Energy complied with its contractual obligations to deliver power to the Debtors at the prices agreed to in advance by the parties, Shell Energy stood to lose a large sum of money. But if it could somehow terminate its obligations to the Debtors and sell instead to third parties at then prevailing market prices, Shell Energy had an opportunity to make a large sum of money.

32.     In furtherance of its scheme, on February 14, 2021, the Shell Defendants first urged the Debtors to agree to a mutual termination of their EEI Master Agreements. The Shell Defendants indicated that if the Debtors declined, the Shell Defendants would find a rationale for termination. The Debtors declined to agree to a mutual termination.

33.     The Shell Defendants then attempted to unilaterally terminate their contractual relationship with the Debtors, without just cause, and before the onset of extreme weather conditions and significant strain on Texas' power grid. The Shell Defendants simply ceased performing their contractual obligations under the parties' various agreements. More specifically, at 10:55 p.m. Central Time on Sunday, February 14, 2021, Shell Energy issued a Notice of Default and Termination to the Debtors ("Termination Notice"), alleging material default under Section 3.17 of the Global Agreement and stating that among other things, ***effective immediately***, (1) it would no longer transact with Entrust under the EEI Master Agreements or otherwise; (2) it was terminating all outstanding Transactions under the EEI Master Agreements; (3) it was terminating all Scheduling Coordinator Agreements (which obligated Shell to schedule electricity deliveries); and (4) it was terminating all lending commitments to the Debtors under the Loan Agreement.

34.     Shell Energy' attempted termination was improper and constituted an attempt to circumvent both its contractual and common law obligations to the Debtors. Shell Energy's Termination Notice was a contrivance to serve the Shell Defendants' commercial goal of extricating themselves from their contractual obligations to the Debtors. Shell Energy sought to do so on the pretext that the Debtors breached Section 3.17 of the Global Agreement by violating the Debtors' own internal risk policies (the "Risk Policy"). Shell Energy was wrong. In fact, the Debtors' Risk Policy stated that the Debtors should have 90% of their forecasted power supply

needs contractually covered unless a lower amount was approved by the Debtors' CEO or Vice President of Finance. When Shell Energy sent its Termination Notice to the Debtors, it had no idea whether the Debtors had violated their own Risk Policy. Having no legitimate basis for termination, Shell Energy hoped (and gambled) that rapidly increasing consumption estimates in the market had caused the Debtors to fall below the 90% hedging goal set forth in the internal Risk Policy, without approval from the Debtors' management. Shell Energy had no basis for reaching this conclusion and no knowledge as to whether the Debtors' CEO or Vice President of Finance had approved maintaining a lower percentage during this unusual time. Shell Energy lost its gamble because its hopeful assumption was wrong. The Debtors were not in violation of their own Risk Policy at the time of the Termination Notice. However, even if the Debtors had been in violation of their own Risk Policy, the Shell Defendants would have still been liable to the Debtors for their subsequent losses.

35. Even if Shell Energy had a proper basis to terminate the parties' agreements, such termination would not have been effective until February 17, which means that Shell Energy was required to deliver electricity to the Debtors through the worst days of Winter Storm Uri—through at least February 17, 2021.

36. Shell Energy, however, immediately ceased delivering electricity to the Debtors after it issued the Termination Notice by electronic mail on February 14, 2021.

37. As a result of Shell Energy's failure to deliver electricity to the Debtors after February 14, 2021, the Debtors were forced to purchase power at real-time market prices from the ERCOT system during the freezing temperatures, without a corresponding and offsetting sale from Shell Energy to hedge the physical delivery obligation and the Debtors' exposure to ERCOT real-time market prices.

38.     On Monday, February 15, 2021, ERCOT real-time market prices reached and remained for several days at $9,000/MWh, a 10,000% increase from pre-storm prices. Shell Energy's Sunday evening termination and decision to immediately cease all deliveries to the Debtors had a debilitating and catastrophic effect on the Debtors' business that made it impossible for the Debtors to pay for the energy that they were forced to procure from ERCOT. This default by the Debtors resulted in almost immediate action from ERCOT (carrying out ERCOT's published protocol) to force the Debtors to send all of their active customers back to ERCOT so that ERCOT could reassign the customers and they could be serviced by the Debtors' competitor (non-defaulting) retail energy providers -- this action permanently destroyed the Debtors' business operations.

39.     Although Shell Energy issued its Termination Notice under the Global Agreement, it failed to issue a Notice of an Event of Default or Termination under the EEI Master Agreements. Importantly, there had been no actual Event of Default under the Global Agreement or any of the EEI Master Agreements.  As a result, even after Shell Energy attempted to wrongfully terminate certain Transactions, it remained obligated to continue to provide electric power to the Debtors under the EEI Master Agreements.

40.     Thus, after issuing its improper Termination Notice, Shell Energy's failure to provide power to the Debtors in the subsequent days constitutes a breach of contract.

**E.     Shell Energy's Notice of Default and Termination Was of No Legal Effect Until Close of Business on February 16, 2021**

41.     Although Shell Energy sent its Termination Notice on Sunday evening, February 14, 2021, it remained contractually obligated to continue deliveries of electric power to the Debtors until February 17, 2021.  Specifically, under Section 10.12 of the Global Agreement,

███████████████████████████████████████████████████████

████████████████████████████████ (emphasis added).

42.     "Business Day" is defined under the Global Agreement to mean ███████████

███████████████████████████████████████████████████████

████████████████████████████

43.     Shell Energy sent its Termination Notice at 10:55 pm on Sunday, February 14, 2021.

44.     The following day, Monday February 15, was Presidents' Day, a legal holiday for commercial banks under the laws of the State of Texas. It was not a Business Day.

45.     Therefore, under Section 10.12 of the Global Agreement, Shell Energy's Termination under the Global Agreement could be of no legal effect until February 17, 2017, or at the earliest, at the close of the next Business Day (Tuesday, February 16, 2021).

**F.     Shell Energy Was Obligated to Continue Delivering Electricity Until the EEI Master Agreements Were Terminated Due to an "Event of Default" As Defined Under Those Agreements**

46.     Even though Shell Energy sent its Termination Notice to Debtors under Section 3.17 of the Global Agreement on Sunday, February 14, 2021, and even assuming that termination was effective that same day (it was not), Shell Energy still had an ongoing contractual duty to deliver power under the EEI Master Agreements until certain conditions were met, as described below.

47.     Section 7.2 of the Global Agreement does not grant Shell Energy the right to terminate its obligations to deliver electric power to the Debtors when there is an Event of Default under the Global Agreement. Rather, Section 7.2 simply states that █████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**G.      No Event of Default Under the EEI Master Agreement Could Occur Until After Close of Business on February 16, 2021**

48.      An Event of Default under the EEI Master Agreements occurs under 5.1(h)(4) upon

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

49.      The definition of "Guarantors" includes the Debtors and the term "Guaranty" is defined to include the Security Agreement. Thus, an Event of Default under the EEI Master Agreements would occur <u>if and when the Security Agreement failed to be in full force and effect</u>, that is, only <u>after</u> the Debtors failed to satisfy all their obligations under the agreements.

50.      The Security Agreement could not fail before the close of business hours on February 16, 2021 because it was not until after the end of business hours on Tuesday, February 16, that Shell Energy could determine whether the Debtors had satisfied all their obligations under the agreements, (*e.g.*, whether the Debtors would complete wiring all required payments to satisfy their obligations under each Transaction). Wire transfers cannot be completed on weekends or holidays and take up to a full business day to go through. Thus, it was not until after the end of business hours on February 16, 2021 that Shell Energy could confirm that no wire transfer had been initiated prior to the Security Agreement ceasing to be in full force and effect.

51.      Section 5.2 of the EEI Master Agreements provides that ████████████████████

████████████████████████████████████████████████



52.     Because an Event of Default could not have occurred under the EEI Master Agreements until after the end of business hours on Tuesday, February 16, 2021 given the notice requirements under that agreement, the earliest Shell Energy could have terminated its obligation to deliver electric power to the Debtors thereunder was Wednesday, February 17, 2021.

53.     Even assuming Shell Energy's Termination Notice under the Global Agreement could have terminated all contractual agreements between the Debtors and the Shell Defendants, including the EEI Master Agreements, the date on which that termination became effective could still be no sooner than February 16, 2021.

54.     Although Section 5.7 of the EEI Master Agreements allows for suspension of performance when a Potential Event of Default has occurred and is continuing, there was no Potential Event of Default here. A "Potential Event of Default" is narrowly defined under the EEI Master Agreements as an event that will become an Event of Default solely by notice or the passage of time; the narrow definition prevents parties from commonly alleging Potential Events of Default as a means of escaping unwanted contractual obligations.

**H.      Shell Energy Failed to Pay Deficiency and Presentment of Claim**

55.     Section 4.1(b) of the EEI Master Agreements between the Debtors and Shell Energy provides that in the event of any unexcused failure by Shell Energy to deliver all or part of the electric power that it is required to provide to the Debtors under the Confirmations, Shell Energy

must "settle" with the Debtors by paying them



56.    Replacement Price is defined under the EEI Master Agreements as the price that the Debtors had to pay for electricity on the open market minus the lower price they would have paid to Shell Energy, including any associated costs that the Debtors incurred:



57.    On March 9, 2021, the Shell Defendants submitted their proposed "settlement calculations" to the Debtors, premised on the incorrect assumption that February 14 was the appropriate termination date under the agreements. Even assuming that February 14 was the correct Early Termination Date to use (it was not), the Shell Defendants revealed their true motives by calculating the Termination Payment in a self-serving way that was clearly contrary to the terms of the EEI Master Agreements.

58.     Under Section 5(2)(ii) of the EEI Master Agreements, Gains and Losses for each

Terminated Transaction ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████     Because Shell Energy transmitted its Termination Notice

at 10:55 p.m. Central Time on February 14, the earliest that the Debtors could possibly have

entered into agreements with third parties to replace the deliveries Shell Energy had contracted to

make under the Terminated Transactions would be February 15. Yet, the Shell Defendants used

replacement prices in its calculation that were unachievable in reality and thus pure fiction:

specifically, they used February 14 forward pricing curves to determine the replacement value of

its balance-of-month sales to the Debtors, and February 12 forward pricing curves to determine

the replacement value of its remaining forward sales to the Debtors.[7] Because forward prices were

escalating steeply and rapidly due to worsening weather forecasts, the Shell Defendants' use of

February 14 and February 12 pricing curves was not just commercially unreasonable but a blatant

attempt to insulate Shell Energy from the deleterious economic effects of ERCOT spot market

prices far in excess of the price at which it had committed to sell power to the Debtors. There was

simply no way that the Debtors replaced (or could have replaced) Shell Energy's sales

commitments at prices based on February 12 or February 14 forward pricing curves, and the Shell

Defendants knew that the actual replacement cost on February 15 or thereafter was far greater. But

use of such fictional replacement prices allowed the Shell Defendants to grossly understate the

amount Shell Energy owed to the Debtors when valuing replacement cost in a commercially

reasonable manner as expressly required by the EEI Master Agreements.

---

[7] A forward pricing cure is a function graph in finance that defines the prices at which a contract for future delivery or payment can be concluded today.

59.     On August 18, 2021, the Debtors invoiced Shell Energy for $124,282,817 ("Invoiced Amount") in accordance with Section 4.1(b) of the EEI Master Agreements. The Invoiced Amount is the sum of: (a) the amount that Shell Energy owes the Debtors under Section 4.1(b) of EEI Master Agreements for Shell Energy's unexcused failures to deliver electric energy through Wednesday, February 17, 2021, (b) the Settlement Amount for each Terminated Transaction (including a netting of amounts owed to the Shell Defendants for purchased power and under the Loan Agreement) as of Wednesday, February 17, 2021, and (c) accrued interest on the foregoing amounts through August 20, 2021 in accordance with Section 6(d).

60.     The Termination Payment for the Settlement Amount was due within two Business Days of the Business Day on which Shell Energy received the invoice pursuant to Section 5.4 of the EEI Master Agreements.

61.     Shell Energy failed to pay the invoiced amounts within the two Business Days required for the Termination Payment, or the five Business Days required for its failures to deliver power, and has yet to pay the invoiced amounts.

62.     Section 6.2 of the EEI Master Agreements provides that ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████

63.     The EEI Master Agreements define the Interest Rate, for purposes of the amount due, as the Revolving Credit Facility Interest Rate plus 500 basis points per annum, provided that the Interest Rate may never exceed the Highest Lawful Rate. The Revolving Credit Facility Interest Rate is defined as LIBOR plus 5.0% per annum. The Highest Lawful Rate is defined as "at any

date the maximum nonusurious interest rate that may then be contracted for, charged or received under applicable law."

64.     Section 5.4 of the EEI Master Agreements provides that ███████████ ████████████████████████████████████████████████████████████████ ██████ By ceasing deliveries of electric power on February 14, 2021 in accordance with its improperly issued notice of that date, Shell Energy made February 14 the effective date on which interest on the Termination Payment began to run.

65.     Shell Energy's failure to pay the Invoiced Amount and accrued interest also constitutes a breach of contract, which proximately caused damages to the Debtors.

66.     The Debtors also are contractually entitled to recover their attorneys' fees and expenses from Shell Energy in connection with Shell Energy's breach of contract. Section 1.56 of the EEI Master Agreements defines "Settlement Amount" as ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ The word "Costs" is defined under Section 1.11 to mean ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (emphasis added).

## V.     CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)

67.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

68.     The Debtors and Shell Energy were parties to the EEI Master Agreements, and other applicable contract documents incorporated therein, which constitute a valid, enforceable contract ("Contracts").

69.     Shell Energy materially breached the parties' Contracts, as described above. For example, and without limitation,

> Wrongful and/or early termination: Shell Energy wrongfully terminated the EEI Master Agreement with Entrust (including all Transactions that were an integrated part thereof), the EEI Master Agreement with Entrust East (including all Transactions and Confirmations that were an integrated part thereof), and the EEI Master Agreement with Power of Texas (including all Transactions that were an integrated part thereof) without the occurrence of a qualifying or legitimate Event of Default.

> Failure to deliver electric power: Shell Energy failed to deliver electric power to the Debtors from at least the period of February 14, 2021 to February 17, 2021 before Shell's improper Notice of Termination became effective.

> Wrongful offset: As discussed, supra, Shell Energy contrived and declared a contrived default, which in reality did not exist, under the Global Agreement certain agreements by and between the Shell Defendants and the Debtors and, based thereon, improperly terminated the EEI Master Agreements such agreements and the parties' respective rights and obligations thereunder. Following the purported termination, and in direct contravention of the express terms of the agreements between the parties, the Shell Defendants purportedly set off obligations of the parties due under the subject various agreements between the parties in an effort to reduce obligations due and owing by Shell Energy to the Debtors (the "Wrongful Setoff").

> Failure to pay invoiced amounts: Shell Energy also materially breached the parties' agreements by failing to pay the Invoiced Amount and/or all other amounts to which the Debtors are entitled under Section 4.1(b) and Article 5 of the EEI Master Agreements.

70.     As a direct and proximate result of Shell Energy's breach of the parties' contracts, the Debtors were forced to bear the cost of purchasing equivalent quantities of electric power in the real-time market administered by ERCOT at dramatically higher prices than agreed to in the contracts with Shell Energy, and thus suffered damages, including but not limited to:

- the difference between the higher ERCOT real-time market prices and the forward contract price for electricity that Shell was contractually obligated to provide to the Debtors under such contracts as well as the associated fees and costs, as described above; and

- the settlement value of the hedges on February 17, 2021, but in no event later than February 16, 2021.

71.     Shell Energy also caused other contractual damages (*e.g.*, attorneys' fees, interest) as outlined herein and as the Debtors will prove upon the trial of this matter.

## COUNT II
### (Declaratory Judgment)

72.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

73.     There exists an actual and present controversy between the parties concerning the effective date of Shell Energy's termination of the EEI Master Agreements.

74.     Accordingly, the Court should issue declaratory judgment that the effective date of Shell Energy's termination of the EEI Master Agreements was February 17, 2021.

75.     There also exists an actual and present controversy between the parties as to whether Shell Energy had a contractual obligation to deliver electricity to the Debtors under the EEI Master Agreements following its delivery of its Termination Notice on Sunday, February 14, 2021, and if so, for how long.

76.     Accordingly, the Court should issue declaratory judgment that Shell Energy had a contractual obligation to deliver power to the Debtors under the EEI Master Agreement through February 17, 2021, but in no event did Shell Energy have the right to terminate providing electricity any earlier than at least February 16, 2021.

77.     Judicial determination concerning (a) the effective date of Shell Energy's termination of the EEI Master Agreements and Confirmations thereunder, and (b) Shell Energy's

contractual obligation to deliver power to the Debtors following delivery of a Notice of Default and Termination on Sunday, February 14, 2021, is needed and will terminate existing disputes of contractual interpretation between the parties.

## COUNT III
### (Disallowance of the Shell Defendants' Claims Pursuant to 11 U.S.C. §502(d))

78.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

79.     The Shell Defendants have filed proofs of claim numbered 89-118, as may be supplemented or amended in which the Shell Defendants seek, inter alia, unspecified amounts due under the contracts as well as various setoff, and other reservations of rights (collectively, the "Claims").

80.     Pursuant to Section 502(d) of the Bankruptcy Code, any and all Claims of the Shell Defendants and/or its assignee against the applicable Debtors' estate, must be disallowed until such time as the Shell Defendants pay to the Debtors all amounts sought herein. The Shell Defendants' secured claim and right of setoff, recoupment and offset should be disallowed and any money that would otherwise be retained by the Shell Defendants should be paid to the Debtors.

## COUNT IV
### (Turnover of Estate Property by Shell Energy Pursuant to 11 U.S.C. §§ 105(a), 541, and 542(a))

81.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

82.     The undisputed portion of the Invoiced Amount and/or all other amounts to which the Debtors are entitled under Section 4.1(b) of the EEI Master Agreements constitute assets of the Estates pursuant to section 541(a) of the Bankruptcy Code.

83.     The Debtors are informed and believe, and based thereon allege, that Shell Energy remains in possession, custody, or control of the Settlement Amount, which includes undisputed amounts.

84.     Shell Energy is not a "custodian" for purposes of section 542(a) of the Bankruptcy Code but is holding proceeds of trades which are undisputed and are property of the Debtors' estates.

85.     As debtors in possession, the Debtors may use, sell, or lease the Settlement Amount in accordance with section 363 of the Bankruptcy Code, or as authorized by this Court.

86.     The Settlement Amount is not of inconsequential value or benefit to the Debtors' estate(s).

87.     Shell Energy has received actual notice of the commencement of the Chapter 11 Cases and, as such, section 542(c) of the Bankruptcy Code is inapplicable.

88.     Shell Energy is not a life insurance company and, as such, section 542(d) of the Bankruptcy Code is inapplicable.

## COUNT V
### (Equitable Subordination under 11 U.S.C. § 510(c))

89.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

90.     Section 510(c) permits the bankruptcy court to subordinate, on equitable grounds, all or part of a lender's allowed claim or interest, to transfer any lien securing a subordinated claim to the bankruptcy estate, or to disallow the claim entirely in the appropriate circumstances, even if no preferential or fraudulent conveyance has occurred.

91.     As more fully set forth herein, the Shell Defendants engaged in inequitable conduct by, among other things, wrongfully terminating their contractual relationship with the Debtors, as

well as damaging the Debtor's creditors, and giving the Shell Defendants an unfair advantage (*e.g.*, causing the Debtors to expend substantial funds that should have gone to payment of creditors in order to buy electricity Shell Energy had a contractual obligation to provide).

92.     Equity dictates that the Court should equitably subordinate the Shell Defendants' claim to "amounts owed to it under certain [contracts]" set forth in the Shell Defendants' Proof of Claim, including amounts owed to Shell Energy for actual power deliveries under the EEI Master Agreements and amounts owed to Shell Energy under the Loan Agreement, both of which amounts would ordinarily be netted against the far larger amount Shell Energy owes the Debtors.

93.     Subordination of the Shell Defendants' claim(s) is consistent with the Bankruptcy Code.

**COUNT VI**
**(Breach of Implied Duty of Good Faith and Fair Dealing)**

94.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

95.     The Shell Defendants and the Debtors had a special relationship between the parties—one that was premised on the superior bargaining power of the Shell Defendants, the commercial relationship between the parties in which the Shell Defendants were given regular access to the Debtors' confidential business plans, trading positions, and financial information, and based upon the trust of the Debtors in reliance on the Shell Defendants to provide the Debtors' core service offerings to consumers.

96.     The Shell Defendants had the implied duty of good faith and fair dealing in the performance of their obligations and provision of electric power to the Debtors pursuant to a common law duty of good faith and fair dealings in their contract performance.

97.     The Shell Defendants breached their implied duty of good faith and fair dealing owed to the Debtors when the Shell Defendants improperly terminated transactions between the parties and Shell Energy refused to provide electricity to the Debtors for redelivery to the Debtors' customers in a transparent effort to capitalize on skyrocketing electricity prices caused by unusually adverse weather conditions.

98.     The Shell Defendants' breach was intentional, knowing, and malicious.

99.     As a proximate result of the Shell Defendants' breach, the Debtors incurred substantial monetary damages as well as attorneys' fees and costs.

<u>**COUNT VII**</u>
**(Avoidance of Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A))**

100.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

101.     The Debtors are informed and believe, and based thereon allege, that one or more of the Transfers were made within two (2) years prior to the Petition Date.

102.     Through the Wrongful Setoff described above, *supra*, the Shell Defendants caused the Debtors to make the Transfers to, or for the benefit of, the Shell Defendants.

103.     The Shell Defendants set off the amounts of the Transfers in direct contravention of the terms of the subject agreements with the actual intent to hinder, delay or defraud creditors of the Debtors, by causing an involuntary transfer by the Debtors, of assets over which the Shell Defendants had dominion and control. Such intent may be imputed to the Debtors or any other transferor for purposes of Section 548(a)(1)(A) by reason of the Shell Defendants' dominion and control over such assets, and can be inferred from the circumstances surrounding the Transfers, including, without limitation, (a) the lack of, or inadequate, consideration as the "setoff" was improper and in contravention of the terms of the subject agreements, (b) the close business

association and relationship between the Debtors and the Shell Defendants, and (c) the improper conduct of the Shell Defendants in manufacturing a basis to declare the purported default and terminate the subject agreements, and subsequent efforts to deny the Debtors proper compensation for the Shell Defendants' misconduct in contravention of the express terms of the subject agreements.

104.     Based on the foregoing, the Transfers are avoidable, and the Debtors are entitled to an order and judgment against the Shell Defendants avoiding the Transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

**COUNT VII**
**(Avoidance of Post-Petition Transfers under 11 U.S.C. § 550)**

105.     The Debtors restate and incorporate each preceding paragraph of the Complaint as if fully stated herein.

106.     The Debtors are entitled to avoid the Transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

107.     Shell Energy was the initial transferee of the Transfers, the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Transfers were made.

108.     Pursuant to 11 U.S.C. § 550(a), the Debtors are entitled to recover from Shell Energy an amount to be determined at trial that is not less than the total amount of the Transfers, plus interest thereon to the date of payment and costs of this adversary proceeding.

**VI.     PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Debtors pray the Court enter judgment in favor of the Debtors on all claims asserted and:

A.  Award the Debtors all damages they prove at trial plus attorneys' fees, costs and expenses, plus interest;

B.  Award the Debtors pre- and post-judgment interest to the extent permitted by law;

C.  Order and declare that the effective date of Shell Energy's termination of the EEI Master Agreement and the Confirmations entered into thereunder was February 17, 2021;

D.  Order and declare that Shell Energy had a contractual obligation to deliver power to the Debtors under the EEI Master Agreement through February 17, 2021, but in no event did Shell Energy have the right to terminate providing electricity any earlier than at least February 16, 2021;

E.  Order and declare that the Transfers are avoided pursuant to 11 U.S.C. § 548(a)(1)(A), and the Debtors are entitled to recover the Transfers or the value thereof, plus interest and costs, pursuant to 11 U.S.C. § 550; and

F.  Award the Debtors all other and further relief which the Court deems just and proper.

Respectfully Submitted,

BAKER & HOSTETLER LLP

*By: /s/ Jimmy D. Parrish*
David J. Richardson *(pro hac vice pending)*
CA State Bar No. 168592
drichardson@bakerlaw.com
Sashe D. Dimitroff
TX State Bar No. 00783970
sdimitroff@bakerlaw.com
Eric W. Kristiansen
TX State Bar No. 24027428
ekristiansen@bakerlaw.com
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 751-1600
Facsimile: (713) 751-1717


Jimmy D. Parrish
Fed. ID No. 2687598
jparrish@bakerlaw.com
Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168


ATTORNEYS FOR
DEBTORS/PLAINTIFFS ENTRUST
ENERGY, INC., ENTRUST ENERGY
EAST, INC., and POWER OF TEXAS
HOLDINGS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via electronic service pursuant to the Texas Rules of Civil Procedure on this 11th day of October 2021.

*/s/ Sashe Dimitroff*
Sashe Dimitroff